ATTORNEYS FOR APPELLANT
Bruce N. Elliott
Ann Arbor, Michigan

Thomas R. Haley III
Carmel, Indiana

ATTORNEYS FOR APPELLEES
Jeffrey C. McDermott
Marc T. Quigley
Indianapolis, Indiana

# In the
# Indiana Supreme Court



**FILED**

Feb 05 2008, 10:17 am

**CLERK**
of the supreme court,
court of appeals and
tax court

No. 49S04-0701-CV-27

AUTO-OWNERS INSURANCE COMPANY,

*Appellant (Plaintiff below)*,

v.

BANK ONE, BANK ONE INDIANA CORP.,
BANK ONE, N.A., BANC ONE, INDIANA,
N.A., AND BANK ONE, INC.,

*Appellees (Defendants below)*.

Appeal from the Marion Superior Court, Civil Division, Room No. 5, No. 49D05-9810-CT-1529
The Honorable Gary L. Miller, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A04-0511-CV-647

**February 5, 2008**

**Sullivan, Justice.**

Kenneth B. Wulf stole more than $500,000 from his employer, Auto-Owners Insurance Company, by depositing checks payable to Auto-Owners into a personal account he opened at Bank One in the name of "Auto-Owners, Kenneth B. Wulf."  Auto-Owners contends that Bank One violated § 405 of the Indiana Uniform Commercial Code by not exercising ordinary care when it opened Wulf's account.  However, we hold that § 405 applies to opening new accounts

only in circumstances not present here.

## Background

Kenneth Wulf worked in the Claims Division of Auto-Owners Insurance from May 1988 until he was terminated in July 1998. Wulf started out as a claims representative, and then became a resident adjustor. In his capacity as a resident adjustor, Wulf handled various kinds of insurance claims for Auto-Owners. One of Wulf's responsibilities was to pursue subrogation and salvage claims on behalf of the insurance company.[1] In the context of this responsibility, Wulf (like other adjustors) handled the file for each case and the checks that Auto-Owners received for subrogation and salvage. When a check arrived, clerical staff would open it and attach it to the relevant file before passing the check and file on to the adjustor. No other record was kept of such checks. It was the adjustor's responsibility to forward the checks back to clerical staff, who would then send the checks to Auto-Owners's main office in Michigan. It was Auto-Owners's policy for all files to be reviewed by a manager every six months.

In 1991, Wulf opened an account at Bank One in the name of "Auto-Owners, Kenneth B. Wulf." (App. at 396.) Wulf used a post office box as the address for the account. Bank One did not request, nor did Wulf provide, any documents to confirm his authorization to open and use the account on behalf of Auto-Owners. Wulf used a stamp that said "Auto Owners Insurance Deposit Only" to endorse checks made out to Auto-Owners and deposit them into his account. (App. at 392.) Wulf deposited a total of $546,000 meant for Auto-Owners into his account over the course of almost eight years. Another Auto-Owners employee discovered Wulf's conduct in 1998, while Wulf was on vacation, during an examination of the file of one of the claims Wulf had handled. Until that time, Auto-Owners did not suspect any untoward activity.

---

[1] In this context, "subrogation" is "[t]he principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy." Black's Law Dictionary 1467 (8th ed. 2004). "Salvage" is "property saved or remaining after a . . . loss, sometimes retained by an insurance company that has compensated the owner for the loss." Id. at 1367.

In the trial court, Auto-Owners alleged that Bank One had failed to exercise ordinary care in its opening of Wulf's account, that this failure substantially contributed to Auto-Owners's losses, and that Bank One was liable for Auto-Owners's losses up to the moment of discovery, regardless of any statute of limitations. Bank One denied that it had failed to exercise ordinary care at any time and contended that the three-year statute of limitations, Ind. Code § 26-1-3.1-118(g), precluded recovery for any checks paid before October 30, 1995. The trial court granted Bank One's motion for summary judgment and denied Auto-Owners's motion for partial summary judgment (on the statute of limitations issue only) on October 15, 2005. The Court of Appeals affirmed. Auto-Owners Ins. Co. v. Bank One, 852 N.E.2d 604 (Ind. Ct. App. 2006). Auto-Owners sought, and we granted, transfer on two questions: whether Bank One was subject to an ordinary care requirement for its actions in opening an account for Wulf, and if so, whether Bank One's failure to exercise ordinary care substantially contributed to Auto-Owners's losses. Auto-Owners v. Bank One, 869 N.E.2d 447 (Ind. 2007) (table). Auto-Owners did not raise the statute of limitations issue in its Petition for Transfer, and we summarily affirm the Court of Appeals on it. Ind. Appellate Rule 58(A).

**Discussion**

**I**

Much of the disagreement in this case revolves around, and our decision rests upon, Indiana's version of § 405 of the Uniform Commercial Code ("UCC"). Section 405 is found in Ind. Code § 26-1-3.1-405 (2004). Subsection (b) is the focus of debate:

> (b) For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the employee or a person acting in concert with the employee makes a fraudulent endorsement of the instrument, the endorsement is effective as the endorsement of the person to whom the instrument is payable if it is made in the name of that person. If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent

3

the person bearing the loss proves that the failure to exercise ordinary care substantially contributed to the loss.

Auto-Owners asserts in its Petition for Transfer that Bank One failed to "exercise ordinary care" in opening a bank account in Auto-Owners's name for Wulf, and that this failure "substantially contributed" to Auto-Owners's loss.  (Appellant's Pet. to Trans. at ii.)

We begin with the question of whether Bank One exercised ordinary care.  Auto-Owners's reading of § 405(b) on this point fails to take into account both the language of and the purpose behind the statute.  Auto-Owners claims that Bank One should have invested more energy in confirming Wulf's legitimacy when Wulf opened a bank account in Auto-Owners's name in 1991.  However, § 405(b) makes no mention of a bank's responsibilities when opening an account for a new customer.  Rather, subsection (b) requires ordinary care from a bank in the "paying" or "taking" of an instrument.  Indeed, Bank One pointed out during oral argument that the procedures in place to be applied during the opening of an account are often there for the protection of the bank, not a particular customer.  See also 2 James J. White & Robert S. Summers, Uniform Commercial Code § 19-4(h) (4th ed. 1995) (implying that bank account-opening procedures may be self protection).  Such an approach, which is not incompatible with the requirements of § 405(b), would suggest that often a bank hurts no one but itself if it fails to follow its own procedures when opening a new account.[2]

As to the purpose behind the statute, the first comment to § 405 reveals, and the Court of Appeals also pointed out, that in the absence of a bank's negligence, § 405 shifts the responsibility for monitoring possibly wayward employees away from a bank and onto the employer.  The rationale for this responsibility shift is that an employer is in a better position to select and supervise its employees than an outside bank.  More relevant to the situation at hand, an employer is also better able to put in place measures to prevent fraud among its employees.  Auto-Owners

---

[2] After the events of September 11, 2001, the nation changed the way it thinks about the potential dangers of undocumented parties opening new bank accounts.  See, e.g., 31 U.S.C. § 5311 (Supp. II 2002) (amended by USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 1, 115 Stat. 272, 326 (2001), to expand purpose of subchapter requiring access to financial records beyond criminal, tax, and regulatory investigation of money laundering to include intelligence and anti-terrorist efforts).  However, Wulf opened his account in 1991.

4

Ins. Co., 852 N.E.2d at 612-13 (citing I.C. § 26-1-3.1-405 cmt. 1). Accord White & Summers, supra, § 19-4.

This is not to say that the circumstances of opening an account could never play a role in whether a bank has used ordinary care in paying or taking a check. Auto-Owners calls attention to the fourth comment to § 405, which outlines a scenario in which an employee might open an account in the name of a prominent corporation and use the account to deposit instruments payable to the corporation. I.C. § 26-1-3.1-405 cmt. 4. By Auto-Owners's interpretation, comment four supports liability for Bank One because the comment countenances an employee doing what Wulf did—opening a bank account in his employer's name. However, the comment states that "[f]ailure to exercise ordinary care is to be determined in the context of all the facts relating to the bank's conduct with respect to the bank's collection of the check." Id. (emphasis added). This emphasis is consistent with the language of § 405(b), which stresses "ordinary care in paying or taking the instrument." Thus, while the manner of opening an account might be considered in the context of all the facts surrounding the paying or taking of a check, the manner of opening an account, by itself, is not a focus of the rule.

In this case, the facts differ materially from the relevant behavior in the comment's example. In the comment, the employee opens an account for a "well-known national corporation" and deposits a check for a "very large amount of money." After the account is credited, the money is transferred out of the account. I.C. § 26-1-3.1-405 cmt. 4. While we may quibble about whether Auto-Owners is a sufficiently well-known national corporation,[3] the vast majority of the checks Wulf deposited were worth well under $10,000[4] and deposited over a period of almost eight years. Many checks had been deposited by the time Auto-Owners noticed a problem. Because "[a]ny cause of action Auto-Owners may have had accrued at the time each check was

---

[3] Auto-Owners's website indicates that it has been doing business in Indiana since 1935. By 1991, it was doing business in 19 states. Auto-Owners Insurance Corporate Information, History, http://www.auto-owners.com/Default.aspx?tabid=102 (last visited Jan. 24, 2008).

[4] This is not to say that an amount over $10,000 is necessarily a "very large amount of money" for purposes of interpreting this example. However, it is instructive to note that Auto-Owners viewed that amount as one up to which employees might settle unsupervised: Wulf stated that he had authority in his position to settle a claim on behalf of Auto-Owners for up to $10,000 without consultation with a superior. Indeed, Wulf suggested that the amount might have gone up to $20,000 at one point.

negotiated by Wulf," Auto-Owners Ins. Co., 852 N.E.2d at 612, a connection between the individual checks currently at issue (those not excluded by the statute of limitations) and the manner of the opening of the account five years before is minimal. Under these circumstances, Auto-Owners may not argue that the opening of the account in 1991 is included in the "context of all the facts relating to . . . the bank's collection of the check[s]," I.C. § 26-1-3.1-405 cmt. 4, after October 30, 1995.

The Court of Appeals has correctly analyzed whether Bank One exercised ordinary care in taking and paying the checks proffered by Wulf after October 30, 1995, in Auto-Owners's name, and found that it did. The language of the statute does not contemplate a general requirement that banks use ordinary care when opening accounts, and Auto-Owners does not raise this question again in the context of the paying and taking of instruments in its Petition for Transfer. Auto-Owners Ins. Co., 852 N.E.2d at 616-18.

## II

Even if Bank One did not demonstrate ordinary care in its acceptance of the checks proffered by Wulf, Auto-Owners must still show that such a lack of ordinary care "substantially contributed" to its losses. The comments to I.C. § 26-1-3.1-406 explain the test:

> The "substantially contributes" test of former Section 3-406 is continued in this section in preference to a "direct and proximate cause" test. The "substantially contributes" test is meant to be less stringent than a "direct and proximate cause" test. Under the less stringent test the preclusion should be easier to establish. Conduct "substantially contributes" to a material alteration or forged signature if it is a contributing cause of the alteration or signature and a substantial factor in bringing it about. The analysis of "substantially contributes" in former Section 3-406 by the court in Thompson Maple Products v. Citizens National Bank of Corry, 234 A.2d 32 (Pa.Super.Ct.1967), states what is intended by the use of the same words in revised Section 3-406(b). Since Section 3-404(d) and Section 3-405(b) also use the words "substantially contributes" the analysis of these words also applies to those provisions.

I.C. § 26-1-3.1-406 cmt. 2. White & Summers define the "substantially contributes" standard expansively: "The acts sufficient to 'substantially contribute' to a material alteration or to the

making of an unauthorized signature are limited only by man's capacity for slovenly business transactions." White & Summers, supra, § 19-3(b). We do not interpret the standard quite as broadly as White & Summers does in the examples that follow this summary, though we agree that those examples may contribute to a party's meeting the "substantially contributes" test. Rather, we look to Thompson Maple Products, which is cited in the second comment to § 406. There, the court followed a chain of company practices that allowed forgery to flourish, and then held:

> While none of these practices, in isolation, might be sufficient to charge the plaintiff with negligence within the meaning of § 3-406, the company's course of conduct, viewed in its entirety, is surely sufficient to support the trial judge's determination that it substantially contributed to the making of the unauthorized signatures.

Thompson Maple Products, Inc., 234 A.2d 32, 36 (Pa. Super. Ct. 1967) (emphasis added).

Thus, to determine whether conduct has substantially contributed to a loss, we follow the second comment to § 406 and ask whether the opening of the bank account was (1) a contributing factor to Auto-Owners's loss and (2) whether the opening of the bank account was a substantial factor in bringing the loss about. I.C. § 26-1-3.1-406 cmt. 2. Like the court in Thompson Maple Products, we will view the conduct of Bank One "in its entirety." 234 A.2d at 36.

Wulf opened an account with Bank One in 1991 and began depositing checks meant for Auto-Owners. Wulf's deception was not discovered for almost eight years. Other than the lack of procedure used in opening the bank account in 1991, Bank One appears to have followed required protocol in depositing checks from Wulf. See Auto-Owners Ins. Co., 852 N.E.2d at 612-16. Even if we assume that Bank One's conduct in opening the account was a contributing factor to Auto-Owners's loss, and meets the first part of the "substantially contributed" test, we agree with the trial court and the Court of Appeals that Bank One's conduct was not a substantial factor in bringing that loss about under the second part of the test. In other words, when viewed in its entirety Bank One's conduct does not meet the "substantially contributed" test. See Thompson Maple Products, 234 A.2d at 36. Indeed, it appears that Auto Owners was the substantial

7

contributor to its own losses, particularly those at issue here, with its less than rigorous monitoring of its files and incoming checks.

For the reasons addressed above, we affirm the trial court's determination that summary judgment for Bank One was appropriate in this case. There is no disagreement between the parties as to the material facts of the case. We agree with the trial court's determination that Bank One was entitled to summary judgment and that Auto-Owners is not entitled to a trial under § 405. We express no opinion as to whether Auto-Owners might have been able to demonstrate Bank One's negligence under another law, regulation, or the common law.

### Conclusion

For the foregoing reasons, we affirm the trial court. The issues not addressed in this opinion, but addressed by the Court of Appeals, are summarily affirmed pursuant to App. R. 58(A).

Shepard, C.J., and Rucker, J., concur. Boehm, J., dissents in part with separate opinion in which Dickson, J., concurs.

**Boehm, Justice, dissenting in part.**

I agree with the majority that the statute of limitations bars much of Auto-Owners's claim against Bank One. I also agree that the principal issues presented by Auto-Owners's claim under the Uniform Commercial Code are (1) whether the bank failed to exercise ordinary care in accepting Wulf's checks, and (2) if so, the extent to which that failure contributed to Auto-Owners's loss. I do not agree that Bank One is entitled to summary judgment because I believe both questions present issues of fact that are not resolvable on summary judgment.

Section 405(b) of the UCC, quoted by the majority, provides that if an employee (here Wulf) is entrusted by the employer (Auto-Owners) with a check payable to the employer and wrongly endorses the check, the endorsement is as good as the employer's as far as a taker in good faith (Bank One) is concerned. But the section goes on to provide that if a bank "fails to exercise ordinary care in paying or taking" the check, and that failure "substantially contributes" to the loss from the employee's fraud, the employer can recover from the bank "to the extent that" the bank's failure "substantially contributed" to the loss.

I believe the facts relevant to the bank's exercise of ordinary care are easily stated, and present an issue for trial. Wulf, an employee of Auto-Owners, opened an account in the name of Auto-Owners Insurance. The designated evidence does not include any documentation of the opening of the account, and the exact nature of the account is not clear from this record. But under any view of this evidence, the account was not owned by an insurance company.[1] The tax identification number obtained for the account was Wulf's social security number, rather than a number appropriate for a business entity. More importantly, opening a bank account for a legal

---

[1] If there ever was any documentation surrounding the opening of the account, Bank One says it is no longer locatable. Wulf testified that he was not asked to provide any documentation. Specifically, he said he supplied no articles of incorporation or board resolution. Wulf also testified that no one asked about his "type of business" or the "type of account" or whether the account was corporate or personal. Wulf testified that he opened the account in the name of "Auto-Owners, Kenneth B. Wulf." Bank statements were mailed to "Auto Owners Insurance," without mention of Wulf, at a post office box. The deposit slips and checks in the designated evidence show the account name as "Auto-Owners Insurance" with "Kenneth B. Wulf" on a second line. This seems to me to suggest either a joint account between two entities or an individual account owned by Wulf using an assumed business name. A bank officer testified that the account holder chooses the names printed on these checks and deposit slips.

entity, such as a business corporation or insurance company, ordinarily requires proof of identity and authority in the form of tax identification numbers and corporate resolutions. See 2 James J. White & Robert S. Summers, Uniform Commercial Code § 19-4(h) (4th ed. 1995). Auto-Owners provided an affidavit from an experienced bank officer to the effect that the prevailing standard for opening a business checking account requires proof of identity and authority. Given the lack of corporate documentation, from Bank One's point of view, the only owner the account could have was Wulf himself, as an individual perhaps using "Auto-Owners Insurance" as his assumed business name. I assume such a name could be used by an insurance agency operated as a sole proprietorship. Ind. Code § 27-1-15.6-10 (2004) (permitting use of assumed names by licensed sellers of insurance if the Commissioner is notified). If so, Auto-Owners designated evidence that it was Bank One's practice, and the practice throughout the industry, to obtain an assumed business name certificate to open such an account. All of this adds up to a genuine issue of material fact as to the bank's exercise of ordinary care in opening the account.

I disagree with the majority's conclusion that the bank's failure to exercise ordinary care can be confined to opening the account. When it came time to deposit checks into this account, Wulf showed up with checks payable to "Auto-Owners Insurance Company" and similar names. That payee would ordinarily be taken to be an insurance company, most of which are organized as corporations.[2] Thus, it seems to me to present at least a jury question whether acceptance of such a check deposited into an individual's account with no authorizing documentation whatever constitutes failure to exercise "ordinary care" as that term is used in section 405(b). The majority suggests that actions in opening the account cannot support recovery under section 405 because that section applies only to "paying" or "taking" an instrument (in this case the checks). But the two cannot be separated. In simple terms, after the account was opened, the bank accepted checks payable to Auto-Owners for deposit into Wulf's personal account, which permitted Wulf to write checks on the account. The initial alleged oversight was in opening an account for an individual under the "Auto-Owners Insurance" name, without either corporate authorization or an assumed business name certificate. But the bank then proceeded to accept checks pay-

---

[2] The name of an Indiana insurance company must include "insurance" and either "company," "incorporated," "corporation," or an abbreviation of one of these terms. Id. § 27-1-6-3. Foreign insurers are exempt from this requirement, provided that the name is authorized by the state in which the foreign insurance company is organized and the name does not "negate the characteristic of such company as an insurance company." Id. § 27-1-17-3.

2

able to an insurance company—a corporate entity—for deposit into an account that was established for an individual under a similar but different name.[3] Whether acceptance of some or all of these deposits also constituted failure to exercise ordinary care is not resolvable on the evidence in this record.

The majority points out that comment 4 to section 405 describes a deposit into an individual account of a large check payable to a well-known corporation as a possible failure of ordinary care. First, it seems clear that this comment recognizes that the circumstances of opening an account may be relevant to whether ordinary care is exercised in subsequently accepting deposits into the account. Moreover, I think the majority reads comment 4 far too restrictively. It is an example, not an attempt to set the bounds of section 405. The point of the example is that discrepancies between the payee, the endorsement, and the type of account can create an ordinary care question. For example, anyone reading the name of the payee on a check payable to General Motors Corporation and endorsed by "General Motors" would wonder why it is being deposited in an individual account. This does not depend on the amount of the check, though I assume the $10,000 checks Wulf deposited were "large" in the context of most individual accounts. Nor does it depend on the prominence of the payee. If the check in any amount were payable to "General Widget Corporation" and endorsed by "General Widget," I would think a jury could find failure to exercise ordinary care if a bank concluded without further investigation that the account was owned by a military officer whose surname was Widget. Here we have acceptance of checks payable to an insurance company, endorsed by a variant of the company's name, and deposited into an individual account created with none of the paperwork associated with a corporate account or an assumed business name.

The majority suggests that any requirements for opening an account in a corporate name are for the benefit of the bank, not the general public. But it is plain that section 405 contemplates liability of the bank for "failure to exercise ordinary care" in accepting an endorsement. I.C. § 26-1-3.1-405 cmt. 1 ("If the bank failed to exercise ordinary care, subsection (b) allows the

---

[3] Auto-Owners supplied an affidavit from an experienced bank officer stating that the existing commercial practice for sole proprietorship accounts was to list first the name of the individual, in this case, Wulf. In this case, the first name on the account was "Auto-Owners Insurance." The affidavit also states that existing commercial practices prohibit the deposit of a corporate check into a noncorporate account.

employer to shift loss to the bank to the extent the bank's failure to exercise ordinary care contributed to the loss."); White & Summers, supra, § 19-3(f) (describing possible failures to exercise ordinary care in accepting an endorsement).  I see no reason why ordinary banking procedures are not evidence relevant to that determination.  As White and Summers explain

> Comment 4 deals with cases in which the prevailing standard is to investigate or at least to get some evidence from the person seeking to open the account that the principal exists and that the person opening the account is an authorized agent.  If the bank fails to comply with the prevailing standard, failure to collect the necessary information may itself be held to be negligence that contributes to the loss.

Id. § 19-4(h).

I disagree with the majority's view of the "substantial contribution" issue in two respects.  First, the majority cites Auto-Owners's substantial contribution to its own losses as a ground for granting summary judgment to the bank.  Slip op. at 7-8.  Assuming the majority is correct that the designated evidence establishes that Auto-Owners contributed substantially to the loss, that does not warrant summary judgment for the bank.  Section 405 sets up a "pure" comparative negligence exercise.  In such a regime, the plaintiff's negligence proportionally reduces, but does not eliminate, the right to recover, even if the plaintiff's negligence is greater than the defendant's.  Arthur Best, Impediments to Reasonable Tort Reform:  Lessons from the Adoption of Comparative Negligence, 40 Ind. L. Rev. 1–2 nn.4–5 (2007) (citing Restatement (Third) of Torts:  Apportionment of Liability § 7 cmt. a (2000)).  Section 405 contains no provision comparable to Indiana's Comparative Fault statute, I.C. § 34-51-2-6, which bars recovery by a plaintiff who is greater than fifty percent at fault.  Without language modifying pure comparative negligence, "to the extent that" means just that, so section 405 permits recovery proportionate to the defendant's contribution to the loss, regardless of its size.  It seems clear to me that the bank's acceptance of these many checks over a period of years substantially contributed to Auto-Owners's loss.  The "extent" of that contribution compared to the lack of oversight attributable to Auto-Owners is a jury question not resolvable on summary judgment.  See White & Summers, supra, § 19-3(d) (describing the comparative fault provisions as "an invitation for a plaintiff to roll the dice with the jury").

Dickson, J., concurs.

4